IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MONICA EBODA,

    Plaintiff,

v.

PNC BANK, NATIONAL ASSOCIATION,

    Defendant.

CIVIL ACTION
NO. 17-707

## OPINION

**Slomsky, J.**                                                                                                                                                                                                         **September 18, 2018**

### I.    INTRODUCTION

Plaintiff Monica Eboda ("Plaintiff" or "Eboda"), a black female, brings this suit against her former employer, Defendant PNC Bank, National Association ("PNC") alleging race and gender discrimination under Title VII of the Civil Rights Act of 1964, 32 U.S.C. § 2000(e), et seq., 42 U.S.C. § 1981, the Civil Rights Act of 1866 ("Section 1981"), and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S.A. § 951 et seq. (Doc. No. 1.) Plaintiff claims that PNC terminated her employment on the basis of her race and gender.

In Count I of her Complaint, Plaintiff alleges violations of Title VII, Section 1981, and the PHRA. (Id. ¶¶ 50-52.) She argues that PNC engaged in acts, or omitted to act, and implemented policies and practices, constituting race discrimination. (Id.) In Count II, she asserts violations of Title VII and the PHRA, claiming PNC engaged in acts, or omitted to act, and implemented policies and practices, constituting gender-based discrimination. (Id. ¶ 53-54.) As a result of PNC's alleged discrimination based on her race and gender, Plaintiff claims that she "suffered harms and losses in the form of back pay and benefits, front pay and benefits and

emotional distress including, but not limited to, harm to her career, anxiety, stress, humiliation and embarrassment. (Id. ¶¶ 52, 55.)

On February 2, 2018, PNC filed the present Motion for Summary Judgment (Doc. No. 25) and an accompanying Memorandum of Law (Doc. No. 27.). In support of the Motion, PNC also filed a Statement of Undisputed Facts. (Doc. No. 26.) Eboda filed a Brief in Opposition to Defendant's Motion for Summary Judgment, in which she disputed several of PNC's undisputed facts and provided a recitation of the facts in the light most favorable to her. (Doc. No. 32.) PNC also filed a Reply Brief in Support of its Motion. (Doc. No. 33.) PNC's Motion for Summary Judgment is now ripe. For reasons that follow, the Court will deny PNC's Motion for Summary Judgment.

## II.  FACTUAL BACKGROUND

Plaintiff Monica Eboda is a black female and former employee of PNC. (Doc. No. 26 ¶ 1.) On May 16, 2005, PNC hired Eboda as a Business Banker III in the Greater Washington D.C. Territory of its Business Banking Department. (Id.) In May 2007, Eboda was promoted to Senior Vice President, Business Banking Territory Sales Manager II in Philadelphia, Pennsylvania. (Id. ¶¶ 9-10.) Later, on December 31, 2009, Eboda rose to the position of Business Banking Market Manager II ("BBMM") and became responsible for growing PNC's business banking market share in Delaware, Southern New Jersey, and Chester County and Bucks County in Pennsylvania. (Id. ¶¶ 11-12.) In addition to Eboda, another PNC BBMM, Lawrence Wirth, covered the Philadelphia market. (Id. ¶ 20.)

Throughout her tenure at PNC, Eboda consistently received satisfactory performance reviews. (Doc. No 32 at 24.) Likewise, from 2011 to 2013, her team achieved exemplary performance rankings—in 2012, her market ranked first in the entire company, and in 2013, her market produced the top performing managers in the country. (Doc. No. 1 ¶ 12-13.) According

2

to Eboda, this kind of performance typically warrants a "focused talent development plan." (Id. ¶ 16.) She, however, never received such a plan. (Doc. No. 26 ¶ 87.) Instead, when she sought guidance from her manager, John Anders, he told her that "there were no other opportunities for her in the bank and he asked her why she would want to do anything else." (Doc. No. 1 ¶ 16; Doc. No. 26 ¶ 91.) Eboda claims that this was not the first time Anders' comments had concerned her. (Doc. No. 1 ¶ 17.) Specifically, Eboda recalls that in her August 2012 mid-year review she asked Anders, "what's next for me?" to which Anders replied that "he could not teach her to do anything else." (Id. ¶ 17; Doc. No. 26 ¶ 91.) When Eboda clarified that she was seeking steps to enhance her performance and intimated that she hoped to mimic his success at PNC, Anders quipped, "no Monica, you're not tall enough." (Id.) Eboda believes Anders made this comment because she is a woman. (Id. ¶ 92.)

Meanwhile, Eboda contends that her white male colleagues, including Lawrence Wirth, were given growth opportunities and were asked to spearhead important projects "that afforded them exposure to senior management and experiential learning on the job."[1] (Id. ¶ 85.) She, on the other hand, did not receive such opportunities, despite maintaining a high performance record and expressing interest in growth opportunities to her supervisors.[2] (Id.)

---

[1] According to the Complaint, PNC promoted Wirth to run the Central Pennsylvania market in 2011 in addition to his responsibilities in the Philadelphia market. (Doc. No. 1 ¶ 19.) At the same time, Eboda applied for open positions to run the Greater Washington D.C. and the Greater Maryland markets. (Id.) PNC, however, denied her requests and instead selected Edward Puzio, a white male, to run the Greater Washington D.C. market. (Id.) Michael Smith, another white male, was picked to lead the Greater Maryland market despite holding a position junior to that of Eboda. (Id.)

[2] Eboda is only suing PNC for "discriminatorily firing her." (Doc. No. 32 at 27.) She is not suing PNC for their failure to promote her, but merely cites this conduct to provide proper context regarding the circumstances of her termination. (Id.)

### A. Plaintiff Eboda's History with PNC Executive Assistant Linda Menhardt

Both Eboda and Wirth received administrative support from Linda Menhardt, an executive assistant who had worked at PNC since October 22, 1984. (Doc. No. 26 ¶¶ 23-24.) Menhardt, a white female, performed administrative work for Eboda and Wirth, as well as their teams, by scheduling travel, sending reports, and attending monthly and quarterly meetings. (Id. ¶ 26.) Although she reported to both Eboda and Wirth, Menhardt was assigned to Eboda's cost center for administrative purposes and thus was one of Eboda's "direct reports."[3] (Id. ¶ 27.) As such, Eboda conducted Menhardt's annual performance reviews. (Id. ¶ 28.)

The record shows that Eboda and Menhardt have long endured a strained relationship. Eboda submits that as early as 2008, Menhardt asked to be transferred from Eboda's cost center to Wirth's cost center. (Doc. No. 26-1 at 46:1-11.) Indeed, Eboda claims that in their initial meeting, Menhardt audibly wondered why she was reporting to Eboda and asked to be transferred to Wirth's center. (Id.) Eboda contends that Wirth frequently echoed Menhardt's request. (Id.) In fact, Eboda asserts that as recently as June 2014, Wirth suggested that Eboda transfer Menhardt to his cost center so that she could solely support him and his team.[4] (Doc. No. 32-1 at 99:21-100:8.)

Moreover, Eboda claims that throughout the eight years that Menhardt worked for her, Menhardt frequently undermined her, treated her with disrespect, and refused to support her or

---

[3] A cost center refers to PNC's finance designation created for budgeting purposes. (Doc. No 26 ¶ 27.) The Court surmises that a "direct report" is a subordinate PNC team member.

[4] Eboda claims that in this June 2014 discussion she informed Wirth that transferring Menhardt to his cost center would mean that Menhardt would no longer support Eboda. (Doc. No. 1 ¶ 27; Doc. No. 32 at 14; Doc. No. 32-1 at 99:21-100:8.) PNC, however, contends that Wirth thought transferring Menhardt to his cost center would have no impact on Menhardt's job responsibilities. (Doc. No. 5 ¶ 27; Doc. No. 26 ¶ 70.)

her team. (Doc. No. 1 ¶ 24; Doc. No. 32 at 17.) Further, she contends that Menhardt "treated her with contempt while she accorded Eboda's white co-worker, Wirth, respect and fairness." (Doc. No. 1 ¶ 24.) Eboda believes that Menhardt's contempt was racially motivated, citing an instance when, in 2008, Menhardt told Brian Stillmock, a PNC Business Banking Sales Manager, that Eboda had only been promoted "because she was black." (Doc. No. 1 ¶ 25; Doc. No. 32-1 at 153:2-154:3.) In his deposition, Stillmock confirmed the comment:

> Plaintiff's Counsel: One of the allegations that [Eboda] made in that lawsuit is that you told [Eboda] about—in March of 2015—so around the time that [Eboda] was fired, you told her that Linda Menhardt had said years ago that the only reason that [Eboda] got the job that she had was because she's black. Is that true?
>
> Stillmock: Yes.
>
> ***
>
> Plaintiff's Counsel: Okay. How did that come about in your talking with [Eboda] during that time, so March of 2015? Just tell us how that came up.
>
> Stillmock: I just—I was shocked to hear Monica was fired, and I said—and she said it related to—didn't go into a lot of detail—said it related to [Menhardt]. And I said, "Well, I'm not that shocked because Linda said the only reason you got the job as market manager was because you're black."

(Doc. No 26-11 at 16:2-17:3.) PNC rejects Eboda's assertion that Menhardt had performance issues and claims that "[b]etween 2008 and 2010, Eboda drafted and signed Menhardt's appraisals, with Wirth's input, and rated her as 'Exceeds.'" (Doc. No. 26 ¶ 29.) Eboda, however, disputes this claim and cites to a document which appears to be Menhardt's 2008 appraisal report, titled "2008 Commitment & Alignment Conversations." (Doc. No. 32-1 at 85-87). The document is mostly typed and contains a series of "commitments" to assess performance objectives and notes Menhardt's own assessment of herself as "exceeds [commitment]." The

5

supervisor's assessment on the typed portion of the form, however, is blank. At the end of the document there are undated handwritten remarks. The handwritten notes read as follows:

- Does not believe in spending time/day with BBTSM – "waste of her time"
- It's beneath her to answer the phones
- Thinks her job is to produce sales/production reports.
- It is petty to hold her accountable to what she said she would do.

Take aways:
Check in w/ BBTSM daily
Discuss and review vacations w/ BBTSM before and after confirmation
Spend a day or 2 with BBTSM monthly
Be present at quarterly team meetings

(Id. at 87.) Eboda contends these are her comments regarding Menhardt's 2008 performance and thus disputes PNC's assertion that she had rated Menhardt as "exceeds [commitments]" in all categories of the performance assessment. (Doc. No. 32 at 3.) She did, however rate Menhardt as "exceeds expectations" from 2011 to mid-2013, and in her end of year evaluation 2013, Eboda rated Menhardt as "meets all expectations." (Doc. No. 26 ¶¶ 30-35.)

To deal with employee conduct issues such as this, PNC has a Corrective Action Policy that provides for progressive action—verbal warning, written warning, probation, final written warning, and conclusion. (Doc. No. 26 ¶ 15.) Eboda, however, admits that she did not utilize the Corrective Action Policy and never issued Menhardt any written or verbal warnings. (Id. ¶ 35.) Instead, she brought her concerns to several PNC Human Resource Business Partners, who uniformly advised her to develop a solution with Wirth because Menhardt supported both of them. (Doc. No. 32-1 at 111:3-15.) As previously noted, Eboda contends that Wirth repeatedly suggested that transferring Menhardt to his cost center would resolve the issue. (Doc. No. 26-1 at 97:12-20.) In August 2014, Eboda next brought her concerns about Menhardt to Ericka Morgan, another PNC HR Business Partner, but Morgan told Eboda to resolve the issue with Wirth. (Doc. No. 26 ¶¶ 37-38.)

6

Later that August, Eboda's relationship with Menhardt further deteriorated when Eboda neglected to invite Menhardt to her wedding vow renewal ceremony in Chadds Ford, Pennsylvania.[5] (Doc No. 26 ¶ 44; Doc. No. 32 at 15.) Then, on October 31, 2014, PNC's Employee Index of Quality ("EIQ") survey scores were released and showed that Eboda's scores had declined significantly from previous EIQ surveys.[6] (Doc. No. 26 ¶ 43.) At the time, Eboda believed she received lower scores because Menhardt was upset at her lack of invite to the vow renewal ceremony and retaliated by giving Eboda a poor review. (Id. ¶ 44.) Although EIQ reviews are confidential, Eboda admits that she communicated her belief to Wirth and other members of her team. (Id. ¶ 45; Doc. No. 32 at 4.)

Finally, the situation came to a head on December 8, 2014 when Eboda notified her team that she had decided to grant Wirth's request to transfer Menhardt and, that effective January 2015, Menhardt would no longer support them. (Doc. No 26 ¶ 47.) On December 22, 2014, Eboda notified Menhardt of the transfer to Wirth's cost center and then submitted a request to have Menhardt transferred through Pathfinder, PNC's computerized HR system. (Id. ¶¶ 48-49.) Later that same day, Eboda informed Morgan of the transfer. (Id. ¶ 50.) At that point, Morgan advised Eboda to wait until after the holidays before acting further and told Eboda that after the

---

[5] Eboda invited every member of her team to her August 22, 2014 vow renewal ceremony except Menhardt, but claims that Menhardt had previously told her "to not include her in anything personal" and by not inviting her, she was merely honoring Menhardt's wishes. (Doc. No. 32 at 15.)

[6] PNC partners with Gallup and surveys its employees twice a year to measure the quality of an employee's experience. (Doc. No. 26 ¶ 39.) The survey, known as the Employee Index of Quality (EIQ) survey, asks PNC employees about engagement and communication and, in part, serves as an employee assessment of their manager's performance. (Id. ¶ 40.) EIQ scores are confidential and managers are prohibited from retaliating against employees for low scores. (Id. ¶¶ 41-42.)

7

holidays, she would set up a meeting with Eboda, Wirth, and Menhardt to discuss the situation.[7] (Id. ¶ 53.) Ultimately, Anders, Eboda's manager, intervened and stopped the transfer. (Id. ¶ 54.)

## B. PNC's Investigation and Subsequent Termination of Plaintiff Eboda

On December 24, 2014, Menhardt lodged an internal complaint against Eboda with PNC's Employee Relations Information Center, claiming that by transferring Menhardt and "eliminating half her duties," Eboda essentially retaliated against her because Eboda believed that Menhardt gave her low EIQ survey scores. (Id. ¶ 58.) In response, PNC assigned Employee Relations Investigator Valerie Walton-Singer to investigate Menhardt's retaliation complaint. (Id. ¶ 59.)

During a two-month investigation, Walter-Singer interviewed between nine and ten PNC employees, including Eboda, Menhardt, Wirth, Morgan, Anders, and members of Eboda's team. (Id. ¶ 60; Doc. No. 26-3 at 35:4-13.) Walton-Singer questioned Eboda twice, first on February 2, 2015, and then on February 4, 2015. (Doc. No. 26 ¶ 61.) In both interviews, Eboda consistently

---

[7] Eboda frequently cites Reeves v. Sanderson Plumbing, 530 U.S. 133 (2000) to dispute portions of PNC's Statement of Facts. She refers to this case for the following proposition: "[i]n reviewing a summary judgment motion, the court is required to disregard testimony of an interested witness where that testimony supports the moving party." (Doc. No. 32.)

At the summary judgment stage, the Court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)). Here, Eboda relies on Reeves to preclude the Court from considering PNC's Statement of Facts which she disputes. The United States Supreme Court in Reeves held that a "court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses." 530 U.S. at 151. Moreover, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Id. at 150. At this stage, however, the Court is evaluating whether any genuine issue of material fact exists without assigning weight to the credibility of certain witnesses.

reported that she did not retaliate against Menhardt and that she had merely granted Menhardt's and Wirth's repeated requests to transfer Menhardt to Wirth's cost center. (Id. ¶¶ 64-65.) Moreover, Eboda told Walton-Singer that Menhardt had performance issues, arrived late to meetings, did not provide clerical support, refused to come to her location once per month, and said it was a waste of time to come to Eboda's location. (Id. ¶ 67; Doc. No. 32 at 7.) Additionally, Eboda admitted that she told Wirth and her team that she thought Menhardt gave her low EIQ scores because she was not invited to her vow renewal ceremony. (Doc. No 26 ¶ 68; Doc. No. 32 at 7.) Eboda also spoke to Walton-Singer about her December 22, 2014 meeting with HR Business Partner Ericka Morgan. (Doc. No 26 ¶ 66.) In particular, Eboda told Walton-Singer that on December 22, 2014 she informed Morgan that she had transferred Menhardt and had already submitted the transfer request in Pathfinder. (Id.)

PNC contends that Eboda's account of Menhardt's transfer was inconsistent with the accounts of other witnesses. (Id. ¶ 69.) In particular, Wirth told Walton-Singer that even though he and Eboda discussed moving Menhardt to his cost center, he never discussed with Eboda that Menhardt would no longer be supporting Eboda or her team. (Id. ¶ 70.) In her interview, Menhardt told Walton-Singer that she never requested a job transfer, but had only discussed a cost center change with Wirth. (Id. ¶ 71.)

In addition, PNC claims that Eboda's account of her December 22, 2014 meeting with Morgan differs from the accounts of other witnesses and documentation obtained during the investigation. Specifically, Morgan told Walton-Singer that on December 22, 2014, Eboda informed her that she was merely planning to transfer Menhardt, not that she had already

9

requested the transfer in Pathfinder.[8] (Id. ¶ 72.) To support her assertion, Morgan forwarded an email to Walton-Singer that Morgan had sent to Anders, Eboda's manager, on December 23, 2014, that provided Eboda was going to: "1) transfer [Menhardt] to [Wirth] in Pathfinder; 2) inform [Menhardt] that she is not [sic] longer reporting to [Eboda] and/or supporting her and her team." (Id. ¶ 74.) Morgan told Walton-Singer that she only later learned that Eboda had already taken steps to transfer Menhardt. (Id. ¶ 75.)

On March 9, 2015, PNC's head of Business Banking Richard Bynum and PNC's Business Banking Territory Executive Robert Poore met with Eboda to hear her side of the story. (Id. ¶ 77.) During the meeting, Eboda again denied that she transferred Menhardt in retaliation for her low EIQ scores, described her long-standing difficulties with Menhardt, and emphasized that the transfer was her delayed acquiescence to Menhardt's and Wirth's requests for Menhardt to work solely for him. (Id. ¶ 78.)

Upon concluding her investigation, Walton-Singer filed a report in which she found that Eboda violated PNC's Code of Ethics "by retaliating against Menhardt for giving low EIQ scores by transferring her to support only Wirth and his team, effectively eliminating one-half of Menhardt's job duties." (Id. ¶ 79.) Further, Walton-Singer reported that Eboda had been dishonest in her December 22, 2014 meeting with Morgan and that she had been dishonest with Walton-Singer regarding her communications Wirth, Menhardt, and Morgan regarding Menhardt's transfer. (Id. ¶ 80.) In her deposition, Walton-Singer testified about Eboda's alleged dishonesty during the investigation. (Doc. No. 32-1 at 179:16-180:4.) She said:

---

[8] In Eboda's Response to PNC's Statement of Undisputed Facts, she vehemently disputes the assertion that she never discussed with Wirth and Menhardt that Menhardt would no longer be supporting her and the assertion that she told Morgan that she was merely planning to transfer Menhardt. (Doc. No. 32 at 7-8.) While the Court acknowledges that these assertions are disputed facts, it cites to them to explain PNC's finding that Eboda was dishonest throughout her dealings with Walton-Singer.

> [Eboda] said that . . . Wirth and [Menhardt] asked for [Menhardt] to solely report to [Wirth] and solely support his team. That was untrue. What was requested is that the cost center be changed. [Eboda] said she was going to make the change, and Monica said she told them she made the change, when, in fact, she changed her story, and that is misrepresenting information during an investigation.

(Id.) PNC's Code of Ethics prohibits all employees from engaging in acts of retaliation and calls on them to "[c]ooperate and provide honest and accurate information in investigations." (Doc. No. 26 ¶ 2.) Accordingly, Walton-Singer concluded that Eboda's violation of the Code of Ethics made her no longer employable under PNC's Fidelity Bonding Policy, which provides "if PNC has a reasonable belief that an employee has engaged in a dishonest act, whether or not it constitutes a crime, coverage under PNC's fidelity bond is suspended and the employee cannot continue working at PNC until coverage is reinstated." (Id. ¶¶ 7, 81.) Finally, on March 12, 2014, Walton-Singer and Poore informed Eboda that her employment with PNC was terminated. (Id. ¶ 83.)

Following Eboda's termination, PNC replaced her with Larry Wirth, such that Wirth now covers both his territories and Eboda's former territories. (Doc. No. 1 ¶ 47.)

### III. STANDARD OF REVIEW

Granting summary judgment is an extraordinary remedy. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010)). A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a

reasonable jury could find for the non-moving party. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). For a fact to be considered "material," it "must have the potential to alter the outcome of the case." Favata, 511 F. App'x at 158. Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Id. (quoting Azur, 601 F.3d at 216).

In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. (alteration in original) (quoting Chambers ex rel. Chambers v. Sch. Dist. of Philadelphia Bd. of Educ., 587 F.3d 176, 181 (3d Cir. 2009)). The Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. Anderson, 477 U.S. at 247–249. Whenever a factual issue arises which cannot be resolved without a credibility determination, at this stage the Court must credit the nonmoving party's evidence over that presented by the moving party. Id. at 255. If there is no factual issue, and if only one reasonable conclusion could arise from the record regarding the potential outcome under the governing law, summary judgment must be awarded in favor of the moving party. Id. at 250.

## IV. ANALYSIS

In the Complaint, Eboda avers race and gender discrimination under Title VII and the PHRA, and race discrimination under 42 U.S.C. § 1981. (Doc. No. 1.) In particular, she claims that PNC terminated her based upon a biased and discriminatory investigation in which PNC believed the accounts of white men and women instead of her own. (Id.) PNC now moves for summary judgment on these claims by arguing (1) that Eboda has not established a prima facie case of discrimination, and (2) that even if she has established a prima facie case, she has not

12

produced any evidence from which a reasonable fact finder could conclude that the legitimate, nondiscriminatory reason proffered by PNC was mere pretext for discrimination.[9] (Doc. No. 27 at 13.) Although Eboda's claims arise under both federal and state law, it is appropriate to analyze them together because "the standards are the same for purposes of summary judgment motions." See Jones v. School Dist. of Philadelphia, 198 F.3d 403, 409 (3d Cir. 1999); Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996); Crawford v. Verizon Pennsylvania, Inc., 103 F.Supp.3d 597, 603 (E.D. Pa. 2015).

Based on the Court's review of the record as set forth above, the Court concludes that Plaintiff has presented ample evidence from which a jury could find in her favor, and that several issues of material fact remain. Thus, for the reasons discussed below, the Court will deny PNC's Motion for Summary Judgment.

### A. A Factfinder Could Reasonably Find That Plaintiff Eboda Has Established a Prima Facie Case of Employment Discrimination Based on Gender and Race.

Title VII clearly proscribes employment discrimination based on race, gender, and other protected classifications. 42 U.S.C. § 2000e-2(a). When, as here, there is no direct evidence of discrimination, a court analyzes a Title VII disparate treatment claim under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Parker v. Verizon Pa. Inc., 309 Fed.Appx. 551, 555 (3d. Cir. 2009).

Under this framework, the plaintiff must establish a prima facie case of discrimination by showing that (1) she is a member of a protected class; (2) she was qualified for the position she

---

[9] In its Motion for Summary Judgment, PNC also argues that Eboda's "non-selection claims" are barred by the statute of limitations. (Doc. No. 27.) Essentially, PNC says that Eboda cannot claim that PNC's failure to promote or select her over white males constitutes employment discrimination because those claims are time-barred under Title VII. (Id.) Eboda, however, clarified her position in her Brief in Opposition to Defendant's Motion, stating that she is only suing PNC for discriminatorily firing her and not for failing to promote her. (Doc. No. 32 at 27.)

sought to attain or retain; (3) she suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d. Cir. 2003). At the summary judgment stage, Plaintiff must prove evidence "sufficient to convince a reasonable factfinder to find all of the elements of [the] prima facie case." Duffy v. Paper Magic Grp., 265 F.3d 163, 167 (3d Cir. 2001). The Supreme Court has articulated that "[t]he burden in establishing a prima facie case of disparate treatment is not onerous." Anderson v. Wachovia Mortg., 621 F.3d 261, 271 (3d Cir. 2010) (citing Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). Indeed, the goal at this stage is to "eliminate [] the most common nondiscriminatory reasons" for the defendant's actions. Id.

Here, viewing the facts in the light most favorable to Eboda, the Court is persuaded that a reasonable factfinder could find that she has established a prima facie case of gender and race discrimination. Specifically, she can show that (1) she is a black female; (2) she was qualified for her position at PNC and consistently performed satisfactorily; (3) PNC terminated her; and (4) PNC's actions give rise to an inference of intentional discrimination.

PNC first contends that Eboda has failed to put forth specific evidence of a prima facie case of either race or gender discrimination. (Doc. No. 27 at 15.) In particular, PNC argues that Eboda is unable to establish the fourth element of her prima facie case because she cannot show that "similarly situated non-African Americans or male employees were treated more favorably." (Id. at 16.) Further, PNC asserts that it engaged in a fair and unbiased investigation in which PNC administrators determined that Eboda retaliated against Menhardt and was dishonest with Walton-Singer. (Id.) PNC claims that as a result of this determination, it found that she violated the Code of Ethics and was no longer employable. (Id.)

14

For her part, Eboda produces evidence to the contrary from which a factfinder could reasonably find that PNC did not engage in a fair and unbiased investigation. Specifically, she submits evidence that PNC gave credence to the accounts of white men and women over her account without sufficient corroborating evidence to support those credibility determinations. First, Eboda shows that PNC found that Eboda retaliated against Menhardt despite the fact that only one witness—Menhardt herself—testified that she believed Eboda's actions amounted to retaliation. (Doc. No. 32 at 30.) Further, Eboda provides evidence that she consistently informed PNC that the transfer was not retaliation but rather the result of Menhardt's and Wirth's repeated requests to move Menhardt to Wirt's cost center. (Id.; Doc. No. 26 ¶¶ 63-65, 78.)

Second, Eboda provides evidence that PNC's determination that she was dishonest was largely based on PNC believing the word of white men and women over that of Eboda. For instance, the report concluded that Eboda lied when she told Walton-Singer that she had discussed with Wirth that Menhardt's transfer would mean that Menhardt would no longer support Eboda. (Doc. No. 26 ¶ 80.) Eboda submits evidence showing that this conclusion was based solely on Wirth's testimony that he believed the transfer would be purely administrative. (Id. ¶ 70; Doc. No. 32 at 31-32.) The record is void of evidence to support PNC's determination that Wirth's account was more credible than Eboda's account, but PNC still believed Wirth and labeled Eboda a liar.

Further, the report found that Eboda lied to Walton-Singer when she told her that on December 22, 2014 she informed Morgan that she had already transferred Menhardt in Pathfinder. (Doc. No. 26 ¶ 80.) This finding is based on two things: (1) testimony from Morgan that Eboda only informed her that she planned to transfer Menhardt, and (2) an email from Morgan to another PNC employee saying that Eboda told her that she planned to transfer

15

Menhardt. (Id. ¶¶ 72-74.) For her part, Eboda contended throughout the investigation that she told Morgan on December 22, 2014 that she had already transferred Menhardt. (Doc. 32 at 31-32.)

In addition to producing evidence regarding the circumstances of her termination, Eboda provides evidence that PNC failed to promote her over white men around 2011 and 2012. (Doc. No. 26 ¶ 85; Doc. No. 1 ¶ 19.) Further, she cites conversations with Anders and Menhardt in which her PNC colleagues made disparaging comments about her race and gender. (Doc. No. 26 ¶¶ 91, 95.) Although Eboda does not claim employment discrimination based on failure to promote or her colleagues' comments, those instances provide important context in this case. In consideration of that context, the fact that Eboda satisfies the first three prongs of a prima face case, and the evidence submitted on summary judgment, the Court is persuaded that genuine issues of material fact exist as to whether Eboda was terminated under circumstances that could give rise to an inference of intentional discrimination, and that a reasonable factfinder could find that Eboda has established a prima facie case of disparate treatment based on race and gender.

### B. Genuine Issues of Material Fact Exist as to Whether Defendant PNC's Proffered Legitimate Nondiscriminatory Reason for Terminating Eboda Was Mere Pretext

Under the McDonnell Douglas burden-shifting framework, once a plaintiff has pleaded a prima facie case, the burden of production shifts to the defendant to articulate some legitimate nondiscriminatory reason for the challenged employment action. Burton v. Teleflex Inc., 707 F.3d 417, 427 (3d Cir. 2013). Here, PNC has provided a legitimate nondiscriminatory reason for Eboda's termination in response to her claims of gender and race discrimination. Specifically, PNC argues that, even if Eboda sufficiently pleads a prima facie case, that she cannot succeed on her ultimate burden because "the undisputed record evidence demonstrates that PNC reasonably believed Eboda retaliated against Menhardt by transferring her because she believed that

16

Menhardt gave Eboda low EIQ scores, and then she lied about her actions and was dishonest during PNC's internal investigation." (Doc. No. 27 at 23.) Thus, Defendant has met its burden of production under step-two of the burden-shifting framework.

Finally, when the defendant meets its burden of production, the plaintiff ultimately must prove by a preponderance of evidence that the legitimate reason offered by the defendant is merely pretext for discrimination. Burton, 707 F.3d at 427 (citing Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)). A plaintiff may survive summary judgment by submitting evidence from which a factfinder could reasonably (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. Keller v. Orix Credit Alliance, 130 F.3d 1101 (3d. Cir. 1997); Fuentes, 32 F.3d at 763. When proceeding by the first method, a plaintiff need not provide evidence that the employer acted with discriminatory evidence, but rather only that there is a genuine issue of material fact as to the credibility of the defendant's rationale. Burton, 707 F.3d at 430.

If the plaintiff's evidence relates to the credibility of the employer's proffered justification, it "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" Fuentes, 32 F.3d at 765 (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992). The Court of Appeals has explained that if the plaintiff produces sufficient evidence to discredit the employer's proffered justification, she need not present additional evidence of discrimination beyond that submitted to support her prima facie case to survive summary judgment. See Burton, 707 F.3d at 427 (citing Fuentes, 32 F.3d at 764). Consequently, the plaintiff is not

17

required to produce direct evidence of discrimination to demonstrate pretext and survive a motion for summary judgment. Id.

At this stage of the proceedings, there are multiple issues of material fact as to whether PNC fired Eboda for the legitimate, nondiscriminatory reasons claimed or whether its decision was based on her gender and race. As noted previously, Eboda has provided evidence that disputes PNC's finding that she engaged in retaliation against Menhardt. (Doc. No. 32 at 31-32.) Specifically, she cites to Menhardt's and Wirth's own statements that they repeatedly asked for the transfer. (Id.) Further, Eboda submits that she was not dishonest with Walton-Singer during the investigation and that PNC valued the accounts of white men and women over her own account without sufficient evidence to make that determination. (Id.)

In addition, PNC states that its determination that Eboda retaliated against Menhardt relied on the fact that Eboda never mentioned Menhardt's insubordination in her performance appraisals. (Doc. No. 26 ¶ 76.) Eboda, however, provides evidence to the contrary. First, she points to the fact that she brought her concerns to several PNC HR Business Partners who uniformly told her to resolve the issue with Wirth. (Id. ¶¶ 37, 67; Doc. No. 32 at 3-4.) Second, she notes conversations that she had with Wirth in which they discussed Menhardt's performance issues and a possible transfer. (Doc. No. 32 at 31-32.) Finally, Eboda disputes PNC's assertion that she consistently gave Menhardt satisfactory reviews and directs the Court's attention to her 2008 assessment of Menhardt in which it appears that she describes Menhardt's insubordination, poor attitude, and performance issues at length. (Doc. No. 32-1 at 85-87.)

Although PNC contends that it terminated Eboda based on a good faith belief that she retaliated against Menhardt and was dishonest in Walton-Singer's investigation, Eboda has produced sufficient evidence that creates genuine issues of material facts as to whether the

investigation and subsequent termination were in fact fair and unbiased. For that reason, the Court is persuaded that a reasonable factfinder could find that PNC's proffered legitimate nondiscriminatory reason is mere pretext for discrimination.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. No. 27) on Counts I and II of the Complaint will be denied. An appropriate Order follows.